**Petitioner: Mary KLINGER,**

v.

**Respondents: ADAMS COUNTY SCHOOL DISTRICT NO. 50, and Board of Education of Adams County School District No. 50.**

**No. 04SC724.**

Supreme Court of Colorado,
En Banc.

March 6, 2006.

Rehearing Denied April 3, 2006.*

* Justice MARTINEZ and Justice BENDER would grant the Petition.

Colorado Education Association, Charles F. Kaiser, Denver, for Petitioner.

Semple, Miller, Mooney & Farrington, P.C., Martin Semple, Melissa Mequi, Denver, for Respondents.

Kathleen Shannon, Denver, for Amicus Curiae Colorado Association of School Boards.

MULLARKEY, Chief Justice.

## I. Introduction

We granted certiorari to determine the meaning of the phrase "ordinary and necessary expenses" as used in section 22–63–202(2)(a), C.R.S. (2005),[1] and as applied to reimbursement for damages incurred by a public school district in this state when one of its teachers resigns without giving the statutorily required 30 day notice.[2] We find that the phrase "ordinary and necessary expenses" limits the damages a school district can recover from a teacher who resigns with insufficient notice to actual expenditures incurred in finding the teacher's replacement. Therefore, we conclude that the court of appeals erred in its analysis of the statutory language and we reverse *Klinger v. Adams County School District No. 50*, 109 P.3d 1014 (Colo.App.2004).

## II. Facts and Procedural History

The petitioner, Mary Klinger, worked as a teacher for Adams County School District No. 50 and its Board of Education (the "District") for 12 years. She worked full-time for 10 years and worked part-time during her final two years of employment with the District. Klinger was employed under an annually renewing employment contract. The employment contract provided:

> If the Teacher abandons, breaches, or otherwise refuses to perform services for the District pursuant to the terms of this Agreement, the District shall be entitled to recover from the Teacher all damages provided by law, including, but not by way of limitation, the right to recover damages in securing the services of a suitable replacement teacher, not in excess of 1/12th [sic] of the Teacher's annual salary.

The contract incorporated by reference the provisions of section 22–63–202(2)(a), which authorizes a school district to withhold certain expenses as damages up to one-twelfth of the annual salary of a teacher who resigns without providing notice of resignation 30 days prior to the succeeding academic year.[3]

---

1. The statute remains unchanged from the time of the events in this case and the present citation is used for convenience.

2. We granted the petition for certiorari on the issue stated as follows: Whether the term "expenses" used in section 22–63–202(2)(a), C.R.S. (2005), for purposes of limiting the damages which a school district can recover to secure the replacement of a teacher who gives late notice of resignation, excludes recovery for the school district's fixed salary overhead for overtime-exempt staff involved in securing the teacher's replacement.

3. The section reads, in relevant part:

> Every employment contract executed pursuant to this section shall contain a damages provision. Pursuant to said provision, a teacher ... shall agree to pay damages to the school district, and the board thereof shall be authorized to collect or withhold damages from compensation due or payable to said teacher ... in an amount up to one-twelfth of the annual salary specified in said employment contract. Said damages shall be paid by the teacher ... or withheld from the teacher's ... salary if said individual abandons, breaches, or otherwise refuses to perform services for said school dis-

In May 2001, Klinger received her assigned teaching schedule for the 2001–2002 school year, which began on August 20, 2001. The schedule created a personal conflict for Klinger who attempted to obtain a change in assignment from the District's administration. The District did not adjust Klinger's assignment and, on August 6, 2001, she accepted a part-time teaching position with the Jefferson County School District. On August 10, 2001, the Adams County School District received her letter of resignation, which was effective immediately.

Following receipt of Klinger's resignation letter, the District informed her that it had incurred costs related to finding her replacement totaling $1,569.50 and had withheld her entire final paycheck totaling $1,426.50, one-twelfth of her net annual salary. The District's itemized breakdown of its costs included: $133.50 for advertising and recruitment activities, $1,389 for the salaries of District employees who interviewed prospective replacements, and $47 for the efforts of non-employee third parties who assisted in finding Klinger's replacement.

Klinger filed a complaint, alleging a breach of contract and a violation of section 22–63–202(2)(a).[4] During the subsequent jury trial, the only witnesses were Klinger and the District's human resources director. The director testified that the District did not specifically advertise for the replacement position, that the employees conducting the interviews were not paid overtime for their work in finding Klinger's replacement, and that no substitute teachers were hired to cover classes for those employees when they were conducting interviews. At the close of the director's testimony, Klinger moved for a directed verdict, arguing that as a matter of law, "expenses" in section 22–63–202(2)(a)

means out-of-pocket expenses and, therefore, the allowable damages were limited to $47. The trial court denied the motion, stating that the jury must determine the "ordinary and necessary expenses" to secure a suitable replacement teacher.

The jury awarded Klinger $133.50, presumably for the District's claimed advertising and recruitment costs. The jury's award was in harmony with the human resources director's testimony that the District hired from an existing applicant pool and did not specifically advertise for the replacement position. The jury did not reimburse Klinger for the portion of her salary the District withheld based on the salaries it paid employees who assisted in finding her replacement. Klinger appealed the trial court's ruling.

The court of appeals affirmed the trial court, holding that the term "ordinary and necessary expenses" was inclusive of salaries paid to employees who assisted in finding a replacement teacher and who otherwise would have been engaged in other projects. Klinger petitioned this court for certiorari review and we granted the petition. We reject the court of appeals' interpretation of the statutory language and therefore we reverse its ruling.

### III. Analysis

■ The result in this case turns on whether the statutory provision limiting a school district's recovery of damages to the "ordinary and necessary expenses" it incurs in finding a replacement for a teacher who resigns with insufficient notice allows recovery of monies paid to salaried employees when the employees would have been paid the same amount regardless of the teacher's late resignation. *See* § 22–63–202(2)(a).

---

trict pursuant to the contract, unless the teacher ... has given written notice to the board thereof no later than thirty days prior to the commencement of the succeeding academic year that the teacher ... will not fulfill the obligations of said individual's contract during the succeeding academic year.... Said damages *shall not exceed ordinary and necessary expenses of a board to secure the services of a suitable replacement teacher* ....

§ 22–63–202(2)(a), C.R.S. (2005) (emphasis added).

4. Prior to trial, the parties stipulated that the District performed all of the activities that it claimed, that the stated itemized costs were accurate calculations, and that the itemized activities were necessary and ordinary to recruit and hire a replacement teacher. However, the parties did not agree on whether the costs asserted by the District constituted "expenses" within the meaning of section 22–63–202(2)(a).

The court of appeals answered this question in the affirmative, reasoning that "ordinary and necessary expenses" in section 22–63–202(2)(a) includes "overhead" when used in the damages context. We find that the court of appeals' holding was inconsistent with the applicable principles.

As the court of appeals noted, the term "overhead" is commonly used in the damages context while the phrase "ordinary and necessary expenses" is not. *Klinger*, 109 P.3d at 1016–17. Had the general assembly meant section 22–63–202(2)(a) to permit recovery for "overhead," it could have utilized that specific term. We decline to endorse the court of appeals' interpretation. Instead, we interpret "ordinary and necessary expenses" in its context and consistently with the relevant caselaw, the education policy priorities expressed by the legislature, and general contract law principles.

### A.

Statutory interpretation is a question of law which this court reviews de novo. *See, e.g., Ryals v. St. Mary–Corwin Reg'l Med. Ctr.*, 10 P.3d 654, 659 (Colo.2000). When interpreting a statute, our task is to give effect to the intent of the general assembly. *See, e.g., Colorado Office of Consumer Counsel v. Pub. Util. Comm'n*, 42 P.3d 23, 27 (Colo.2002). We avoid interpreting a statute in a way that would defeat the obvious intent of the legislature. *Id.*

When interpreting the general assembly's intent, we turn first to the language of the statute. *See, e.g., People v. McCullough*, 6 P.3d 774, 778 (Colo.2000). We read words and phrases in context and construe them literally according to common usage unless they have acquired a technical meaning by legislative definition. *People v. Yascavage*, 101 P.3d 1090, 1093 (Colo.2004). Where the language is clear and unambiguous, we do not resort to other rules of statutory construction. *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 284 (Colo.2000); *McCullough*, 6 P.3d at 778. However, where the language is ambiguous we rely on other factors such as legislative history, the consequences of a given construction, and the end

to be achieved by the statute. *Yascavage*, 101 P.3d at 1093.

Section 22–63–202(2)(a) indicates that the phrase "ordinary and necessary expenses" is an additional limitation on the damages cap of one-twelfth of the amount of the resigned teacher's annual salary. The recovery a school district may obtain "*[s]hall* not exceed" such expenses. § 22–63–202(2)(a), (emphasis added). The use of the word "shall" indicates that the legislature intended that the limitation on damages to the school district's expenses be mandatory, not hortatory. *See, e.g., Reg'l Transp. Dist. v. Outdoor Sys., Inc.*, 34 P.3d 408, 420 (Colo.2001).

Prior interpretations of the statute have construed "ordinary and necessary expenses" as a required limitation. *Stackhouse v. Sch. Dist. No. 1, County of Denver*, 919 P.2d 902, 905 (Colo.App.1996) (section 22–63–202(2)(a) requires that school board prove withheld amount does not exceed "ordinary and necessary expenses" incurred in securing a suitable replacement teacher). None of our prior cases has construed what qualifies as an "expense" under the statute. *See id.* at 905 (summary judgment reversed and case remanded to trial court for determination of "actual expenses" incurred by school board); *Klinger*, 109 P.3d at 1016.

Looking to the general definitions of "ordinary and necessary expenses," it is apparent that it is commonly used in accounting or tax law terminology. Black's Law Dictionary defines an "expense" as "[a]n expenditure of money, time, labor, or resources to accomplish a result; esp. a business expenditure chargeable against revenue for a specific period." *Black's Law Dictionary*, 598 (7th ed.1999); *see also Webster's Encyclopedic Unabridged Dictionary* 680 (Deluxe ed.1996) ("expenses" defined as "charges incurred during a business assignment or trip [or] money paid as reimbursement for such charges"). An "expenditure" is defined as "[t]he act or process of paying out; disbursement." *Black's* at 598. And an "ordinary and necessary expense" is defined as "[a]n expense that is normal or usual and helpful or appropriate for the operation of a particular trade or business and that is paid or

incurred during the taxable year." *Id.* at 599.

These definitions explain the phrase "ordinary and necessary expenses" in a technical taxation or accounting context, but they do not address what the term means in the damages context. The difficulty here is that the stock definitions apply specifically to the usual operation of a business in which expenditures are chargeable against revenue, a purpose quite different from the calculation of damages. The court of appeals recognized that use of "ordinary and necessary expenses" in the damages context is unusual when it examined the Colorado and federal statutes that employ the term and found that the term is most commonly used in the computation of taxable income and the reimbursement of expenses for an employee or agent. *Klinger,* 109 P.3d at 1016. Finding no guidance in the other statutory uses of the phrase "ordinary and necessary expenses," the court of appeals asserted that the term "overhead" is generally used for determining damages and found that "ordinary and necessary expenses" includes "overhead" when employed in section 22-63-202(2)(a). *Id.* at 1017. We find that the court erred in this conclusion.

The common usage meaning of "expenses" is not equivalent to "overhead," which has been defined as "[b]usiness expenses (such as rent, utilities, or support-staff salaries) that cannot be allocated to a particular product or service; fixed or ordinary operating costs." *Black's* at 1129. "Overhead" describes the continuous and indirect costs of running a business. *See* S.R. Shapiro, Annotation, *Overhead Expense as Recoverable Element of Damages,* 3 A.L.R.3d 689, § 1[a] (1965). The term "expense" is more commonly used to describe a specific outlay or disbursement of funds. *Black's* at 598; *see State v. Savage,* 255 N.W.2d 32, 38 (Minn.1977) ("reasonable costs and expenses" includes actual cash outlays incurred by reason of condemnation proceeding but not time spent by landowner or landowner's employee due to condemnation proceeding); *Escanaba & Lake Superior R.R. Co. v. Keweenaw Land Ass'n, Ltd.,* 156 Mich.App. 804, 816–19, 402 N.W.2d 505, 511–12 (Mich.Ct.App.1986); *United Power v.*

*Moxness,* 267 N.W.2d 814, 818 (N.D.1978) (citing *Savage* and *Black's Law Dictionary,* (Rev. 4th Ed.), and finding term "expenses" is more limited in scope than "damages" and refers to an actual cash outlay).

The condemnation cases cited above parallel the interpretation of statutory language at issue here. In *Escanaba,* the trial court found that under Michigan's Uniform Condemnation Procedures Act, the property owners defending the condemnation action were to be reimbursed for all salaries and fringe benefits they paid staff and in-house counsel who worked on the case, reasoning that, had the suit not been filed, those employees would have been working on other projects in furtherance of their employer's interest. 156 Mich.App. at 816–17, 402 N.W.2d at 511. The Court of Appeals of Michigan disagreed, holding that the defendants were only entitled to recovery of salaries and benefits that would not have been paid otherwise. *Id.* at 817–18, 402 N.W.2d at 511–12. The relevant statutory language limited reimbursement to "reasonable costs and expenses" and the court, citing *Savage,* found that the term "expenses" in the statute contemplated "only out-of-pocket outlays of money and [did] not include salaries to ... employees ... that would be paid even if the condemnation proceeding had not been brought." *Id.* at 818, 402 N.W.2d at 511–12.

In all three of these condemnation cases, the interpretation of the term "expenses" in the statutory language to limit recovery to actual cash outlays was determinative. Although *Savage, Escanaba,* and *Moxness* did not involve employment, we find persuasive the reasoning applied to the relevant statutory language in those cases.

### B.

Before finally settling on the meaning of the statutory phrase, we test our interpretation of "ordinary and necessary expenses" in this context against the general assembly's expressed policy to balance the rights of teachers and school districts and the applicable principles of contract law.

**1.**

Current article 63 of title 22 was enacted, in substance, as article 18 of chapter 123 in C.R.S.1963. The substance of the damages provision of section 22–63–202(2)(a) was enacted in 1967 under section 123–18–7. Ch. 435, sec. 1, § 123–18–7, 1967 Colo. Sess. Laws 976, 978. There is no extant legislative history for the 1967 act. In 1990, the article was repealed and reenacted at its present location and titled the "Teacher Employment, Compensation, and Dismissal Act of 1990."

The 1990 reenactment included a legislative declaration absent from prior enactments, which stated:

> The general assembly hereby finds and declares that this article is enacted to ensure that the educational system of the state of Colorado is being served by the best teachers available while at the same time allowing such teachers the academic freedom necessary to provide the best education possible to the children of this state.

§ 22–63–102, C.R.S. (2005). This pronouncement evidences the legislature's desire to balance the public and private interests of school districts and teachers through the Act.

One such interest is a school district's desire to discourage last minute resignations which disrupt preparations for the coming school year and force the district to scramble to find replacement teachers. The Adams County School District takes the position that a deterrent is needed to prevent the complications of last minute teacher vacancies. The District suggests that section 22–63–202(2)(a) should be read to effectuate the most expansive damages provision in the interest of deterring late resignations.

Klinger contends that the District's interpretation of section 22–63–202(2)(a) places an inordinate burden on the backs of its teachers. She asserts that the legislature's intent was to reimburse a school district for actual outlays, not the cost of salaries that would have been paid in any event, up to one-twelfth of a teacher's annual salary. According to Klinger, had the legislature intended to enact a deterrent penalty provision, it would have included language to that effect and levied a flat one-twelfth salary deduction instead of capping damages at "ordinary and necessary expenses."

■ We are persuaded by Klinger's position that the legislature, in balancing the interests of school districts and their teachers, did not intend section 22–63–202(2)(a) strictly as a penalty for teachers who fail to give adequate notice. As this case illustrates, the interests of school districts are not always on one side of this type of dispute. While the Adams County School District may have been damaged by Klinger's actions, the Jefferson County School District benefited from her late decision to change schools. Imposing a prohibitive deterrent penalty on the teacher in such instances may also penalize the hiring school district.

Furthermore, a high damage award serves as a disincentive to teacher mobility. In this case, there was no bad faith. Klinger's personal conflict made it difficult for her to fulfill her assignment. Her application for reassignment evidences her attempt to comply with school district procedures. The District denied her request and penalized her one month's salary for resigning with late notice. This inequitable result does not reflect the balancing of interests invoked by the legislative declaration of section 22–63–102.

The mere possibility of a one-twelfth salary deduction is deterrent enough for the average, modestly-paid teacher. We are reluctant to read a more stringent penalty into the statute without legislative direction. The "ordinary and necessary expenses" language tempers the permissible damage award, protecting teachers' interests, and limiting the school district's recovery to actual expenditures in the service of finding a replacement teacher.

**2.**

■ In addition to being consistent with the general assembly's particular choice of language, this interpretation of "ordinary and necessary expenses" is supported by basic contract principles which apply here because section 22–63–202(2)(a) was incorporated by reference into Klinger's employment contract. In this regard, we are informed by

the general objective of remedies for breach of contract that such damages be compensatory, not punitive. Restatement (Second) of Contracts § 356 cmt. a (1981).[5] Liquidated damages provisions are permitted, and, in fact, encouraged as long as those provisions are "reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." *Id.* § 356(1). For this reason "[a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *Id.*

▮▮▮▮ Our courts have stated that a contract provision for liquidated damages is invalid as a penalty if it is unreasonably large for the expected loss from a breach of contract. *Bd. of County Comm'rs of Adams County v. City & County of Denver,* 40 P.3d 25, 32 (Colo.App.2001). Unless the contract on its face establishes that the stipulated liquidated damages are so disproportionate to any possible loss as to constitute a penalty, the determination of whether the specified damages constitute a penalty is a question of fact. *Rohauer v. Little,* 736 P.2d 403, 410 (Colo.1987). In order to determine whether a liquidated damages provision constitutes a penalty, the court must consider:

(1) whether the parties intended to liquidate damages; (2) whether the amount of liquidated damages, when viewed as of the time the contract was made, was a reasonable estimate of the *presumed actual damages* that the breach would cause; and (3) whether, when viewed again as of the date of the contract, it was difficult to ascertain the amount of *actual damages* that would result from a breach.

*Id.* (emphasis added).

Section 22–63–202(2)(a), incorporated into a teacher's contract, only produces a reasonable estimate of *actual damages* if the limitation on the damage award to "ordinary and necessary expenses" is read to include only actual expenditures or cash outlays. The District's proposed reading of the statutory language—interpreting "ordinary and necessary expenses" to include salaries that would

be paid out regardless of whether or not a breach of contract occurs—results in an unreasonable estimate of presumed actual damages to the school district. As a result, the District's interpretation renders the liquidated damages provision a penalty. We decline to read the legislature's intent behind the phrase "ordinary and necessary expenses" in section 22–63–202(2)(a) in such a way as to create a punitive remedy.

Therefore, we construe "ordinary and necessary expenses" in section 22–63–202(2)(a) to limit damages to actual cash outlays, consistent with its statutory context, the public policy interests stated by the general assembly, and basic contract law.

## IV. Conclusion

Consequently, we find that the court of appeals erred in determining that the phrase "ordinary and necessary expenses" in section 22–63–202(2)(a) allows for recovery of overhead. We find that the term "ordinary and necessary expenses" in the statute does not include overhead for the purposes of calculating statutory damages. We reverse the judgment of the court of appeals and remand to the court of appeals to return the case to the trial court with directions to enter judgment for Klinger in an amount consistent with this opinion.

Justice MARTINEZ dissents, and Justice BENDER joins in the dissent.

The majority opinion concludes that the term "ordinary and necessary expenses" excludes the costs typically incurred by the District when searching for a replacement teacher. The majority notes the Black's Law Dictionary definition of "expense" as "[a]n expenditure of money, time, labor, or resources to accomplish a result," and "ordinary and necessary expense" as "[a]n expense that is normal or usual and helpful or appropriate for the operation of a particular

---

**5.** We are directed to the Restatement of Contracts by the Restatement (Second) of Agency, which states: "An agent who commits a breach of his contract with his principal is subject to

liability to the principal in accordance with the principles stated in the Restatement of Contracts." Restatement (Second) of Agency § 400 (1958).

trade or business and that is paid or incurred during the taxable year." Maj. op. at 1032–33. Nonetheless, the majority avoids the obvious conclusion that "ordinary and necessary expenses" includes the usual and normal expenditures of money, time, labor, and resources. The majority reaches this result by limiting this definition to a tax or accounting context, finding "ordinary and necessary expenses" ambiguous and looking to the law of condemnation for guidance. I read the plain meaning of "ordinary and necessary expenses" as the "normal or usual" expenditure of resources including those costs typically incurred by the District when searching for a replacement teacher. Therefore, I respectfully dissent.

Following its analysis of the court of appeals' decision and an examination of the legislative history of the statute, the majority concludes that limiting "ordinary and necessary expenses" to actual cash outlays is "consistent with its statutory context, the public policy interests stated by the general assembly, and basic contract law." Maj. op. at 1034. The majority reaches this conclusion by eschewing the plain meaning of the term and finding "ordinary and necessary expenses" ambiguous. The majority justifies this move by finding the definition of "ordinary and necessary expenses" different in the taxation or accounting context than in the damages context of condemnation cases.

The majority's approach runs counter to principles of statutory construction that mandate we look first and foremost to the plain and ordinary meaning of words when interpreting a statute. *People v. Yascavage,* 101 P.3d 1090, 1093 (Colo.2004). Absent ambiguity in the statute, we need not look to additional principles of statutory construction. *Id.* We abandon the literal language of a statute to give effect to the legislative intent only where a literal interpretation would lead to an absurd result. *Crowe v. Tull,* 126 P.3d 196, 201 (Colo.2006).

Here, the statutory language is straightforward. It states in relevant part: "Said damages shall not exceed ordinary and necessary expenses of a board to secure the services of a suitable replacement teacher or chief administrative officer." § 22–63–202(2)(a), C.R.S. (2005). The statute calls for the reimbursement of ordinary, not extraordinary expenses—as in those expenses incurred in the usual course of business.

The contractual language is consistent with this approach:

Damages. If the Teacher abandons, breaches, or otherwise refuses to perform services for the District pursuant to the terms of this Agreement, the District shall be entitled to recover from the Teacher *all damages provided by law, including,* but not by way of limitation, *the right to recover damages in securing the services of a suitable replacement teacher, not in excess of 1/12th [sic] of the Teacher's annual salary.*

(Emphasis added). Both the statute and the contractual provision call for the reimbursement of the ordinary and necessary costs of finding a replacement teacher. There are no caveats suggesting these costs should be limited to cash outlays or extraordinary costs not incurred by the District in the usual course of business. If anything, the terms "ordinary" and "necessary" suggest that a teacher is liable for costs typically incurred by the District when searching for a replacement, even "the costs of salaries that would have been paid in any event." Maj. op. at 1033.

Although there may be differences in how the term "ordinary and necessary expenses" is employed in the context of accounting or taxes as compared to the damages context, the majority uses this distinction to effectively read "ordinary" and "necessary" out of the statute entirely. In lieu of a plain reading of "ordinary and necessary expenses," the majority turns to the distinction drawn between "overhead" and "expenses" in the damages context. Maj. op. at 1032. After determining that "expenses" are more limited in scope than "overhead," *see id.,* the majority argues that its result is more consistent with the legislative intent. This analysis finds ambiguity where there is none and does not offer an explanation as to why a literal reading of the statute would lead to an absurd result.

Throughout the majority opinion there is an assumption that actual expenditures or damages do not include the ordinary costs of finding a replacement, such as "salaries that would be paid out regardless of whether or not a breach of contract occurs." Maj. op. at 1034. The problem with this assumption is that it ignores the economic notion of scarcity entirely. When the District employs its resources to find a teacher's replacement, it is shifting those resources away from other activities. By shifting these scarce resources away from their next best alternative uses, the District's overall costs of operation rise. These are real costs that amount to "actual expenditures" despite their indirect nature.

In direct contrast, the majority limits recovery to a much narrower view of costs. Maj. op. at 1033–34. In effect, the majority limits recovery to excess or superfluous costs not incurred in the usual course of business. This is especially apparent given that the parties stipulated that "the itemized activities were necessary and ordinary to recruit and hire a replacement teacher." Maj. op. at 1030 n. 4.

Finally, although the majority examines the legislative history and the public policy underlying the statute to discern the legislative intent, it is not clear that the majority's conclusion accords with that intent. The majority finds the statute balances the interests of school districts and their teachers. Maj. op. at 1033. However, the majority's conclusion that "ordinary and necessary expenses" are limited to cash outlays fails to strike the appropriate balance. The statute's stated goal is to "ensure that the educational system of the state of Colorado is being *served by the best teachers available* while at the same time allowing such teachers the academic freedom necessary to provide the best education possible ..." Maj. op. at 1033, quoting Teacher Employment, Compensation, and Dismissal Act of 1990, § 22–63–102, C.R.S. (2005) (emphasis added). The penalty provision of section 22–63–202(2)(a) provides an incentive for teachers to give the District sufficient notice, which thereby gives the District a larger time frame to find suitable replacements and imposes some rigidity in the labor market in favor of the District. This clearly assists the District in finding the "best teachers available" and does not affect the concomitant consideration of affording teachers "academic freedom." *See id.*

Further, by providing a cap on damages of one-twelfth of a teacher's annual salary, the legislature effectively mitigated a teacher's liability. This mitigation suggests the legislature was well aware that the potential costs of finding a suitable replacement could exceed a teacher's monthly salary and that such costs would be excessive. This cap—not the extraordinary outlay restriction imposed by the majority—is the one intended by the legislature as a suitable balance to the District's interests. And contrary to the suggestion of the majority and Klinger, *see* maj. op. at 1033, this cap on damages by no means undermines the overall goal of deterrence; rather, it recognizes that beyond some point, excessive liability has a diminished effect on deterrence and offers no net benefit.

In sum, the statute is not ambiguous and giving effect to the plain meaning of "ordinary and necessary expenses" does not lead to an absurd result. Accordingly, it is the court's imperative to interpret the phrase literally so as to effectuate the intent of the legislature. The majority's interpretation of "ordinary and necessary expenses" does not reflect its plain meaning, is inconsistent with the legislature's stated goal, and exceeds the bounds of our rules for statutory construction. Because the majority interprets "ordinary and necessary expenses" in a manner so narrow it does not comport with its plain and ordinary meaning, I respectfully dissent.

I am authorized to say that Justice BENDER joins in this dissent.